UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

--------------------------------------------------------x
                        :
LUIS ARGUELLES                  :           3:11 CV 254 (JBA)
                        :
V.                            :
                        :
MICHAEL J. ASTRUE,        :
COMMISSIONER OF SOCIAL SECURITY   :        DATE: AUGUST 21, 2012
                        :
-------------------------------------------------------- x

RECOMMENDED RULING ON PLAINTIFF'S MOTION TO REVERSE THE DECISION
OF THE COMMISSIONER, AND ON DEFENDANT'S MOTION TO
AFFIRM THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff Disability Benefits ["DIB"] and Supplemental Security

Income ["SSI"] benefits.

I.  ADMINISTRATIVE PROCEEDINGS

On July 30, 2008, plaintiff, Luis A. Arguelles, applied for SSI and DIB claiming that

he has been disabled since June 21, 2008, due to a lung condition, drug and alcohol

addiction, and Hepatitis C.[1]  (Certified Transcript of Administrative Proceedings, dated April

26, 2011 ["Tr."] 122-32, 167).[2]  Plaintiff's application was denied initially and upon

reconsideration.  (Tr. 57-74, 88-93; see Tr. 137).  On  May 6, 2009, plaintiff filed a request

---

[1]Plaintiff has a history of Hepatitis B in addition to Hepatitis C.  (See Tr. 320, 339).

[2]On April 24, 2006, plaintiff applied for DIB claiming an onset date of disability of October 1, 2005, and for SSI, which applications were denied on or about July 19, 2006.  (Tr. 136-37; see Tr. 167, 209-35).  Plaintiff had significant earnings in 2007, so that plaintiff has not sought to reopen those 2006 applications (Tr. 134; Dkt. #23, Brief at 1, n.1), and thus, this Recommended Ruling will not address the related documents in the administrative transcript.

for a hearing before an Administrative Law Judge ["ALJ"] (Tr. 77-78; see Tr. 79-87), and on September 23, 2010, a hearing was held before ALJ Deirdre Horton, at which plaintiff testified. (Tr. 26-55; see Tr. 94-121).  Plaintiff was represented by counsel.  (Tr.  75-76). On October 15, 2010, ALJ Horton issued her decision finding that plaintiff has not been under a disability because plaintiff would not be disabled if he stopped his substance use.  (Tr. 4-19).  The decision was selected for review by the Decision Review Board ["DRB"] and on January 19, 2011, the DRB issued its Notice informing plaintiff that it had not completed a timely review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3).

On February 15, 2011, plaintiff filed his complaint pro se,[3] and two days later, this case was referred from United States District Judge Janet Bond Arterton to this Magistrate Judge.  (Dkts. ##1, 4).  On May 5, 2011, defendant filed his answer, with a copy of the certified administrative transcript attached.  (Dkt. #10).[4]  In the absence of any action by plaintiff or compliance with this Court's scheduling orders, and after multiple warnings to the pro se plaintiff, this case was closed on September 23, 2011.  (Dkts. ##11-17).   On November 16, 2011, counsel appeared for plaintiff and filed a Motion to Set Aside Judgment, which motion was granted on December 2, 2011, with an order that the case would be reopened on April 2, 2012.  (Dkts. ##18-21).  Thereafter, on April 20, 2012, plaintiff filed the pending Motion to Reverse the Decision of the Commissioner, with brief and exhibits in support (Dkt. #23),[5] and on June 12, 2012, defendant filed his Motion to Affirm.  (Dkt. #24;

---

[3]Plaintiff commenced this action in forma pauperis.  (Dkts. ##2, 5).

[4]The certified administrative transcript is dated April 26, 2011.

[5]Attached to plaintiff's brief are copies of case law.

see also Dkts. ##25-26).

For the reasons stated below, plaintiff's Motion to Reverse the Decision of the Commissioner (Dkt. #23) is granted in part, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #24) is denied.

## II. FACTUAL BACKGROUND

### A. ACTIVITIES OF DAILY LIVING AND HEARING TESTIMONY

Plaintiff was born in Puerto Rico in 1961 and is fifty-one years old.  (Tr. 34). He attended school until the tenth grade (Tr. 51), and he received his GED in Spanish in 1989 while he was incarcerated.  (Tr. 51, 54-55, 172).  Spanish is his primary language.  (Tr. 54, 166).  Plaintiff has never been married but he has three teenage children (Tr. 34), and he lives in an apartment with his mother.[6] (Tr. 33, 174).

Plaintiff has a driver's license but he does not drive because "sometimes [he] see[s] things or [his] mind just go[es] blank and it's dangerous[.]"  (Tr. 35).   He takes the bus, or friends or relatives drive him places.  (Id.).  Plaintiff's breathing affects his ability to walk such that he can only walk about a half a block before he has to rest, and he cannot walk up stairs because he gets short of breath.  (Tr. 40; see Tr. 180, 206).  According to plaintiff, he is limited in his ability to lift, squat, bend, stand, reach, walk, sit, kneel and climb stairs. (Tr. 179).  He can only lift ten pounds or less. (Id.).  Sometimes plaintiff has to "walk a little bit to catch the bus" so that he can get his methadone.  (Tr. 47).  He has problems with his breathing all the time, and that is what makes him so tired; he cannot breathe.  (Tr. 53, 175, 202).   He uses an inhaler about every hour.  (Tr. 53).  Plaintiff used to smoke but stopped when his doctor told him he would be put on oxygen.  (Id.).  Additionally, plaintiff reports

---

[6]Plaintiff's father killed himself at the age of sixty. (See Tr. 352).

that he is in a lot of pain.  (Tr. 175).

Plaintiff has Hepatitis C that causes pain and swelling in his liver which causes nausea and vomiting.  (Tr. 40-41).  He feels his pain about seven or eight times a month and it lasts a "few hours."  (Tr. 41-42).  According to plaintiff, his pain makes him feel as though he will pass out.  (Tr. 177).

Plaintiff testified that he takes medication to sleep (Tr. 42)[7] because he gets up two to three times a night and is up an hour before falling back to sleep.  (Tr. 43).  He has difficulty bathing because of pain when he bends (Tr. 175; see Tr. 177), but he is able to dress and groom himself.  (Tr. 178).  He watches television during the day, and does "hardly nothing[,]" although he does see his children when they are out of school on the weekends. (Tr. 43-44, 174, 178).  According to plaintiff, he can "take care of [himself][,]" but his mother does the cooking, cleaning and grocery shopping.  (Tr. 43, 174, 176, 206).  When he sees his children, they watch television together and they attend church on Sundays.  (Tr. 44).

Sometimes he stays by himself because he does not want "to be bothered[,]" like when he feels depressed -- about twice a week.  (Tr. 44).  When he is depressed, he has suicidal thoughts, he hears voices telling him to kill himself, and sees things at night.  (Tr. 45, 202).  Sometimes plaintiff has crying spells, once or twice a week, and they last about twenty minutes at a time.  (Tr. 45-46, 50).  Plaintiff does not read because he cannot concentrate.  (Tr. 45). However, plaintiff also reported that he can pay attention for "a long time[,]" can follow written directions, can get along well with authority figures, and can

---

[7]Plaintiff takes or has taken Tramadol, Protonix, Docusate, and Symbicort.  (Tr. 176). Plaintiff testified that he stopped taking his medications when he lost his State medical insurance. (Tr. 49-50).  At the time of the hearing, he was trying to find another psychiatrist but had not found one.  (Tr. 50).

handle stress and changes in routine.  (Tr. 180).

Plaintiff also testified that he has panic episodes where he feels like he is being followed, or he feels he is being watched.  (Tr. 46).  Plaintiff also gets angry "for nothing" and gets "too hyper" and throws "stuff around."  (Tr. 48).  When that happens, he feels like locking himself in a room so he does not hurt anyone, or himself or his mother.  (Tr. 49).

At his hearing, plaintiff testified that he last used heroin when he had a relapse eight months prior, but before that, it had been two years with the help of methadone treatment.  (Tr. 46-47).  According to plaintiff, he last drank when he had four beers over the Labor Day weekend on 2010, but before that he had not had a drink in almost a year.  (Tr. 48).  Plaintiff was incarcerated several times, the most recent in approximately 2007 for eighteen months on a domestic violence charge.  (Tr. 49).  Prior to that he was incarcerated for burglary and selling drugs.  (Id.).

### B. PLAINTIFF'S WORK HISTORY & VOCATIONAL ANALYSIS

Plaintiff worked sporadically from 1977-2008, which work history included work as a factory plater and machine operator.  (Tr. 133-36, 141-44, 146, 154-59, 194).  Plaintiff last worked at an aluminum finishing plant from 2006 to 2008 where he packed and racked pieces that go into the aluminum plating. (Tr. 36-37, 168, 182).  The pieces weighed about forty pounds, and he spent the entire work day on his feet.  (Tr. 37).  According to plaintiff, he stood and crouched for three hours, walked and kneeled for one hour, and reached, and handled small objects for eight hours of the work day.  (Tr. 168; see Tr. 196).  The heaviest weight he lifted was eighty pounds though he frequently lifted less than ten pounds.  (Id.).  Plaintiff had difficulty breathing there because of his asthma, and he felt weak almost all of the time, such that he would take at least one day off each week.  (Tr. 37-38).  He would

have to take breaks to rest for five or ten minutes two or three times each afternoon.  (Tr. 38-39).  Plaintiff was laid off and collected unemployment insurance benefits for a year and a half.  (Tr. 52; see Tr. 167).

Prior to his job as a plater, plaintiff worked as a drill press operator and cutting machine operator, in which job he would stand for the full work day.  (Tr. 195).  He would frequently lift ten pounds.  (Id.).

In a vocational analysis completed on November 18, 2008 for Connecticut Department of Disability Services ["CT DDS"], it was noted that plaintiff was capable of lifting twenty-five pounds frequently and fifty pounds occasionally, was capable of walking, standing or sitting for about six hours of an eight-hour workday, had occasional limits on his ability to climb ladders, ropes or scaffolding, and should avoid concentrated exposure to extreme cold and heat and fumes.  (Tr. 184).  Similarly, on April 15, 2009, plaintiff was given a psychiatric RFC for work of light exertion, and he was expected to be able to return to work as a hand packager.  (Tr. 198).

C. MEDICAL RECORDS

1. PRE-ONSET MEDICAL RECORDS

Plaintiff's medical records begin with a letter to Dr. Adrian Klufas from Dr. Walter Lucia of Cardiac Associates of Southern Connecticut, dated July 30, 1999, in which Dr. Lucia reported that he saw plaintiff in his office on July 28, 1999 for a syncopal episode, but after reviewing the normal EKG, Dr. Lucia opined that plaintiff might have experienced a seizure while he was under the influence of drugs as "[t]here [was] no question in [Dr. Lucia's] mind that [plaintiff] was under the influence while in [the doctor's] office." (Tr. 252; see Tr. 253).

In August 2001, a chest x-ray revealed bilateral bolus emphysematous changes worse

on the left than on the right, and mild bilateral interstitial prominence consistent for underlying chronic obstructive pulmonary disease ["COPD"].  (Tr. 267).  Two years later, in May 2003, chest x-ray results revealed extensive bullous changes, particularly in the left lung.  (Tr. 266).

In January 2005, plaintiff was treated at Bridgeport Hospital for abdominal distention, which was not confirmed through diagnostic imaging.  (Tr. 254-55, 265).  In February 2005, plaintiff underwent a chest x-ray to rule out pneumonia, which revealed scarring in the left upper lobe.  (Tr. 256-58, 263-64).

On October 31, 2005, plaintiff was admitted to the "ASATU" program at Southwest Connecticut Mental Health System for alcohol detoxification, where he stayed until his requested early discharge, "against medical advice[,]" on November 4, 2005.  (Tr. 286-314). Medical records indicated that plaintiff had more than twenty detoxs in the past but no rehab, and plaintiff had been on methadone maintenance for two years.  (Tr. 286, 288, 293, 299, 312).  Plaintiff denied any past psychiatric history.  (Tr. 294, 299; see also Tr. 302-10). Plaintiff was assigned a GAF of 25. (Tr. 307).  Plaintiff relapsed to alcohol abuse the day after his discharge (see Tr. 322), and he returned to the ASATU program on November 30, 2005, where he stayed until December 5, 2005.  (Tr. 315; see Tr. 315-38).  At that time, he reported drinking three six packs of beer a day, with a thirty-one year history of alcohol abuse and a twenty-seven year history of opioid abuse, the latter of  which was successfully maintained on methadone.  (Tr. 315).  Plaintiff was assigned a GAF of 40 (Tr. 332), and upon discharge, he was prescribed Wellbutrin, Zyprexa, and Haldol for depression and hallucinations, as well as Plaquenil for sarcoidosis.  (Tr. 318).

As of December 2005, a chest x-ray revealed that there was scarring seen in the left

7

upper and right upper lobes of plaintiff's lungs, and lucencies seen in both upper lungs, "probably related to bullous disease." (Tr. 260). On a second x-ray, large bullae were seen in the left lung. (Tr. 261-62). On December 15, 2005, plaintiff underwent an ultrasound of his abdomen after complaining of right upper quadrant pain. (Tr. 358, 376-77; see Tr. 362, 374-75, 378). The results revealed a fatty liver, and gall bladder changes were suggestive of adenomyosmatosis. (Tr. 358, 376-77).

Plaintiff returned to the ASATU detoxification program over a month later at which time he was treated from January 24, 2006 to February 2, 2006. (Tr. 339-55). He was assigned a GAF of 45. (Tr. 339). On February 17, 2006, plaintiff appeared at the emergency room of St. Vincent's Medical Center requesting detox and claiming to be suicidal. (Tr. 499-507). Plaintiff was transferred to Hall-Brooke for treatment. (See Tr. 499).[8] On March 27 and 28, 2006, plaintiff returned to the emergency room with suicidal ideation. (Tr. 491-98).

On May 5, 2006, an ultrasound of the abdomen revealed mild hepatomegaly with evidence of fatty infiltration. (Tr. 359-60). On May 19, 2006, Ben Pardo, MS and Dr. Jonathan Harland completed a Medical Source Statement in which they assessed plaintiff's condition while abusing alcohol. (Tr. 236-39). They diagnosed plaintiff with major depressive disorder, recurrent, severe, with psychotic features, and alcohol-induced psychotic disorder. (Tr. 236). On June 4, 2006, plaintiff was seen at the emergency room at St. Vincent's Medical Center for intoxication and suicidal ideation; he was diagnosed with depressive disorder, NOS, and polysubstance abuse, and was referred for counseling. (Tr. 486-90).

On January 10, 2007, plaintiff was treated in the Liberation Program for heroin

---

[8]There are no records from Hall-Brooke in the administrative transcript.

addiction after an apparent relapse.  (Tr. 519-23).  Plaintiff reported his last use of heroin on January 6, 2007 and his last use of cocaine on December 26, 2006.  (Tr. 521).   Three days later, plaintiff was treated at St. Vincent's Medical Center's emergency room after being involved in an automobile collision wherein he injured his low back.  (Tr. 482-85; see Tr. 479-81).

On December 11, 2007, plaintiff underwent a chest x-ray at Bridgeport Hospital.  (Tr. 517).  Over six months later, plaintiff was hospitalized at St. Vincent's Medical Center under the care of Dr. Klufas from May 31, 2008 to June 5, 2008 for pancreatitis, during which hospitalization it was noted that plaintiff has "extensive bullolus emphysema [and] a left pleural mass which [is] suspicious for bronchogenic carcinoma."  (Tr. 558; see Tr. 418-26, 541-61).  Plaintiff also had "cardiac dryhythmia" during the hospitalization.  (Tr. 426).  Dr. David Bushell recommended a PET scan to rule out cancer, and Dr. Landau recommended an ultrasound of plaintiff's liver.  (Tr. 559, 561).

On June 16, 2008, plaintiff was admitted to Bridgeport Hospital for two days for alcohol-related pancreatitis, acute gastroenteritis which resolved spontaneously, and alcohol abuse. (Tr. 268-84, 510-16).  The day prior to admission, he drank eight cans of beer.  (Tr. 270).

## 2. POST-ONSET MEDICAL RECORDS

As stated above, plaintiff has alleged an onset date of disability as of June 21, 2008. (Tr. 128).  On July 22, 2008, plaintiff was seen by Dr. James Lettera for his emphysema; Dr. Lettera noted that plaintiff was smoking two packs a day and drank twelve beers daily.  (Tr. 441-42; see Tr. 604-05). Dr. Lattera also noted that plaintiff had abdominal pain, nausea, weakness and fatigue.  (Tr. 441).  On July 29, 2008, plaintiff was seen at Associates of

Pulmonary Medicine; his history of substance abuse, COPD, pancreatitis, bipolar disorder, hypertension, depression, cough, and shortness of breath on exertion were all noted.  (Tr. 431-34).  By August 5, 2008, plaintiff had decreased his smoking to half a pack a day.  (Tr. 428-30, 437-39).  Symbicort and Combivent were prescribed for his bullous emphysema.  (Tr. 429).   On August 21, 2008, plaintiff inquired into a smoking cessation program.  (Tr. 435-36).

On November 1, 2008, Dr. Jeffery Bigelow examined plaintiff for CT DDS.  (Tr. 445-47).  Dr. Bigelow noted plaintiff's complaint of pain in his pancreas, "significant pain in his abdomen[,]" shortness of breath when he took a flight of stairs or walked a half a block, depression, poor sleep, weakness, and tiredness from his medications, which, at that time, included methadone, Symbicort, Combivent, Folate, Tramadol, Colace, and Protonix.  (Tr. 445-46).  Dr. Bigelow noted that plaintiff appeared tired, his liver appeared enlarged, and plaintiff became wheezy and short of breath on walking.  (Tr. 446-47).   He also noted that plaintiff had "audible wheezing and decreased breath sounds consistent with moderate to severe COPD[,]" and "[d]ue to this respiratory compromise," plaintiff would have difficulty with work-related activities that required him to perform with exertion, including lifting, carrying heavy objects, standing or walking for prolonged periods, or engaging in prolonged conversations.  (Tr. 447).

Twelve days later, on November 12, 2008, Dr. Firooz Golkar completed a Physical Residual Functional Capacity Assessment (Tr. 448-55) of plaintiff in which he opined that plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, stand and/or walk, or sit for about six hours in a work day, and his ability to push and pull was unlimited.  (Tr. 449).  Plaintiff could occasionally climb ladders, rope or scaffolds, but could otherwise

frequently climb, balance, stoop, kneel, crouch, or crawl.  (Tr. 450). Plaintiff needed to avoid concentrated exposure to extreme heat or cold, and avoid moderate exposure to fumes, odors, dusts or gases (Tr. 452), and Dr. Golkar opined that plaintiff's alleged physical limitations could not be supported.  (Tr. 453).

On January 29, 2009, plaintiff underwent a psychosocial evaluation at Southwest Community Health Center's Behavioral Health Department ["SWCHC"], at which he complained of depression.  (Tr. 568-78).   He was treated until February 5, 2009.  (Tr. 579). At that time, plaintiff was not taking any psychotropic medications (Tr. 570), although his thought content was concrete and his concentration was "[g]ood[,]" but his remote memory was impaired, and his insight, judgment and impulse control were fair. (Tr. 571).  He was assigned a GAF of 49. (Tr. 579).  Plaintiff reported pain in his stomach for the past eight months.  (Tr. 576).[9]

From February 19, 2009 to March 12, 2009, plaintiff voluntarily checked-in at the Westport Campus of St. Vincent's Medical Center after presenting with a severely depressed mood in the context of recent alcohol abuse, drinking twelve beers daily over the past month, "secondary to his depressed mood."  (Tr. 528, see Tr. 528-40).   Plaintiff's mother had called 911 after plaintiff threatened to kill himself.  (Tr. 531).   His admitting diagnoses were major depressive disorder, severe recurrent, alcohol dependence, and opiate abuse, and he was assigned a GAF of 29.  (Tr. 538).  Upon discharge, plaintiff's condition improved, and he was given Zoloft and Trazadone.  (Tr. 529).

Dr. Jesus Lago examined plaintiff for CT DDS on April 6, 2009 (Tr. 456-57), in which record he noted that plaintiff was taking methadone, Tramadol, Trazodone and Zoloft.  (Tr.

---

[9]Clinic notes from February 5, 2009 to March 30, 2009 indicate no change in plaintiff's mental health status.  (Tr. 598).

456). Dr. Lago noted that plaintiff's mood was depressed, his affect was mildly constricted, but appropriate, his insight and judgment were fair, his impulse control was good, and his cognition was intact. (Tr. 457).  According to Dr. Lago, "[w]ith continued absence from drugs and follow[-]up mental health care, [plaintiff] should improve."  (Tr. 457).

On April 14, 2009, Dr. Arthur Waldman completed a Physical Residual Capacity Assessment of plaintiff for SSA (Tr. 458-65), in which he opined that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, was unlimited in his ability to push and pull, and could stand, walk or sit for about six hours in a work day.  (Tr. 459).  Plaintiff could never climb ladders, rope or scaffolds, but could occasionally climb stairs, balance, stoop, kneel, crouch, or crawl.  (Tr. 460).  Additionally, plaintiff had to avoid all concentrated exposure to extreme cold and avoid moderate exposure to fumes, odors, dust and gases. (Tr. 462).  The next day, Gregory Hanson, PhD completed a Psychiatric Review Technique of plaintiff for SSA (Tr. 466-78), in which he assessed Listing 12.04 only to conclude that plaintiff had mild restrictions in daily activities, mild difficulties maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation.  (Tr. 466, 476; but see Tr. 469).

Records from SWCHC, dated April 6, 2009, indicated that plaintiff was doing "moderately well in treatment." (Tr. 580).   He was admitted for outpatient treatment from April 6 to June 23, 2009. (Tr. 593-94).   On April 21, 2009, plaintiff underwent another psychiatric evaluation during which plaintiff reported "many" suicide attempts and problems with anger or impulse control. (Tr. 564-67).   He was diagnosed with major depressive disorder, alcohol dependence, and opioid abuse, and he was assigned a GAF of 30.  (Tr. 566).  On May 19, plaintiff complained of anxiety and stress, and on May 26, 2009, plaintiff

12

reported doing "very well on Abilify[,]" and he was sleeping well.  (Tr. 562-63).  He was also taking Sertraline, Trazadone, and Seroquel.   (Id.).   On June 23, 2009, plaintiff was "unsuccessfully discharged from treatment for non-compliance attendance, and positive urines."  (Tr. 593; see Tr. 581-92, 595-97).  It was noted that plaintiff did not do well in treatment, "never made an effort to stop his use[,]" and had only one negative urine out of eleven submitted.  (Tr. 593).   Plaintiff repeatedly testified positive for methadone[10] and benzodiazepines.  (Id.). His GAF at discharge was 45.  (Id.).

Eight days later, on July 1, 2009, plaintiff underwent an intake evaluation at Family Services, formerly Family Services Woodfield ["FSW"], during which plaintiff reported depression, anxiety, nervousness and suicidal thoughts.  (Tr. 609-16; see Tr. 639).  His symptoms included crying spells, sleep disturbance, screaming from bad dreams, and resulting fear of sleeping, abnormal eating patterns, feelings of hopelessness, always feeling angry, fatigue, guilt/worthlessness, agitation, rapid thoughts, thoughts of harming himself, and feelings of being followed.  (Tr. 609-10).  Plaintiff reported that he wanted to go back to work but had "pancreatitis - now stable[, and] [l]ung problems[.]" (Tr. 606).  Plaintiff was agitated, anxious, depressed, irritated, and oriented X3, and his memory was impaired, and his concentration and abstract reasoning were fair.  (Tr. 613).  He was assigned a GAF of 33. (Tr. 614).  On August 6, 2009, plaintiff was diagnosed with major depressive disorder, recurrent, with psychosis, and heroin dependence in recovery, and was assigned a GAF of 45.  (Tr. 607).[11]

---

[10]See note 11 infra.

[11]Plaintiff continued to receive methadone treatment in late 2009-2010.  (Tr. 524-56). Plaintiff was seen at the Liberation Program on October 20 and November 23, 2009, at which time he was advised that he could not receive take home methadone treatment until he was current with his bills.  (Tr. 524).  In January, February and March 2010, plaintiff continued to attend and

On June 23, 2010, plaintiff returned to FSW after having lost his SAGA benefits which kept him from getting medication, although it was noted that plaintiff was receiving Seroquel from his primary care doctor.  (Tr. 617, 622).  He was seeking treatment for his depression which had increased over the last six months.  (Tr. 617).  He was experiencing crying, sleep disturbance, decreased interest or pleasure, loss of initiative, anger/irritability, fatigue, impaired concentration, anxiety, and nightmares.  (Tr. 617-18).  Plaintiff denied any use of alcohol or drugs.  (Tr. 619).   His mood was depressed, his thought process was intact, his thought content was lucid, his insight was good, his judgment, concentration and abstract reasoning were fair, and he had no suicidal thoughts.  (Tr. 621).  He was diagnosed with mood disorder, NOS, opioid dependence, in full remission on methadone maintenance, rule out major depressive disorder and rule out bipolar disorder.  (Tr. 622-23).  He was assigned a GAF of 53.  (Id.).  Seven days later, when plaintiff requested to see a psychiatrist for medication management, he appeared agitated and was interested in "more immediate care." (Tr. 634). Plaintiff was seen on July 14 and 16, 2010 (Tr. 634, 637), and on July 20, 2009, plaintiff was feeling more motivated.  (Tr. 635; see Tr. 636).  On July 26, 2010, plaintiff was diagnosed with major depressive disorder, recurrent, severe without psychotic gestures, and was assigned a GAF of 45.  (Tr. 625; see Tr. 626-28, 632).  Plaintiff was discharged on September 14, 2010 after not showing for his last three appointments, and not having insurance (see Tr. 638); he had no improvement in his depression, anxiety, symptoms, or level of functioning.  (Tr. 629-31).  He was a assigned a GAF of 33 upon discharge.  (Tr. 630).

---

discussed how to reduce his bill, including calling SAGA.  (Tr. 525).  In March, plaintiff had a positive breathlyzer for alcohol use after drinking a "few beers the night before."  (Tr. 525-26).  Plaintiff reported in April that he had a "drink here and there[.]" (Tr. 526).

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).   However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.   See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See  42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of

not less than 12 months."  42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.  See 20 C.F.R. § 404.1520(a).  If the claimant is currently employed, the claim is denied.  See 20 C.F.R. § 404.1520(b).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.  See 20 C.F.R. § 404.1520(c).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work.  See 20 C.F.R. § 404.1520(e).  If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. § 404.1520(f); see also Balsamo, 142 F.3d at 80 (citations omitted).

The Commissioner may show a claimant's Residual Functional Capacity ["RFC"] by using guidelines ["the Grid"].  The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical

16

strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled.  See 20 C.F.R. § 416.945(a)(defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations).  A proper application of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered.  See 20 C.F.R. § 200.00(e)(2).  If the Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on his residual functional capacity.  See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996), citing Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986).

## IV.  DISCUSSION

Following the five step evaluation process, ALJ Horton found that plaintiff has not engaged in substantial gainful activity since June 21, 2008, the alleged onset date of his disability.  (Tr.  10; see 20 C.F.R. §§ 404.1520(b), 404.1571).  ALJ Horton then concluded that plaintiff has the following severe impairments: moderate to severe chronic obstructive pulmonary disease; alcohol abuse in partial remission; nicotine dependence; opioid abuse in remission on methadone; and depressive disorder, NOS (Tr. 10; see 20 C.F.R. §§ 404.1520(c) & 416.920(c)), but his impairment or combination of impairments do not meet or equal an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404.  (Tr. 10-11; see 20 C.F.R. §§ 404.1520(d), 416.920(d)).  In addition, at step four, ALJ Horton found that after consideration of all of the impairments, including the substance abuse disorders, when

plaintiff is using substances, he cannot maintain work on a regular and consistent basis.  (Tr. 11-12).  Plaintiff cannot perform his past work, and based on all of his impairments, including the substance abuse disorders, there are no jobs that exist in significant numbers in the national economy that plaintiff could perform.  (Tr. 12-13; <u>see</u> 20 C.F.R. §§ 401.1560(c), 404.1566, 416.960(c), 416.966).   The ALJ concluded that if plaintiff stopped the substance use,[12] the remaining limitations would cause more than a minimal impact on his ability to perform basic work activities; therefore, plaintiff would continue to have a severe impairment or combination of impairments, but would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13-14; <u>see</u> 20 C.F.R. §§ 404.1520(d), 416.920(d)).  If plaintiff stopped substance use, he would have the RFC to lift and carry twenty pounds occasionally and ten pounds frequently, stand and/or walk for about six hours, and sit for about six hours; plaintiff must avoid concentrated exposure to fumes, dusts, temperature extremes, and other respiratory irritants; and he can engage in unskilled work activities; he can remember, understand and carry out short simple instructions; he can relate appropriately to coworkers and supervisors on a superficial basis; and he can respond appropriately to ordinary changes in the workplace.   (Tr. 14-18; <u>see</u> 20 C.F.R. §§ 404.1567(b), 416.967(b)).   The ALJ found that if plaintiff stopped the substance use, he would continue to be unable to perform his past relevant work, but there would be a significant number of jobs in the national economy that he could perform.  (Tr. 18; <u>see</u> 20 C.F.R. §§ 404.1560(c), 404.1566, 416.965, 416.960(c), 416.966).  The ALJ concluded that because plaintiff would not be disabled if he stopped the substance use, his substance use

---

[12]Throughout her decision, the ALJ refers to "substance use" rather than substance abuse. (<u>See</u> Dkt. #23, Brief at 22).

18

disorders are a contributing factor material to the determination of disability.  (Tr. 19; <u>see</u> 20 C.F.R. §§ 404.1535, 416.935).  Thus, the ALJ found that plaintiff has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of her decision.  (<u>Id.</u>).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds that the ALJ erred in failing to properly evaluate plaintiff's physical impairments (Dkt. #23, Brief at 18-19); the ALJ's findings with respect to "substance use" are based on errors of law and/or are not supported by substantial evidence (<u>id.</u> at 20-25); the ALJ's findings with respect to plaintiff's credibility and claims of pain are flawed (<u>id.</u> at 25-31); the ALJ failed to develop the record (<u>id.</u> at 31-33); the ALJ failed to perform a combination of impairments analysis (<u>id.</u> at 33-35); the ALJ's evaluation of plaintiff's residual functional capacity is fatally flawed (<u>id.</u> at 35-36); and the ALJ's evaluation of plaintiff's mental impairments is unsupported (<u>id.</u> at 37).

In response, defendant contends that the ALJ properly evaluated plaintiff's physical impairments (Dkt. #24, Brief at 5-7); the ALJ properly considered plaintiff's substance abuse as the majority of evidence following June 2009 demonstrates that plaintiff was not disabled under his alleged period of sobriety (<u>id.</u> at 8-11); substantial evidence, including plaintiff's subjective complaints and symptoms, activities of daily living, criminal history, and receipt of unemployment benefits, supports the ALJ's credibility determination (<u>id.</u> at 11-16); the ALJ adequately developed the record as there were no gaps in the record (<u>id.</u> at 16-17); the ALJ properly considered plaintiff's impairments in combination (<u>id.</u> at 18-19); substantial evidence supports the ALJ's RFC determination, which determination included the consideration of Dr. Bigelow's opinion (<u>id.</u> at 19-21); and substantial evidence supports the ALJ's evaluation of

plaintiff's mental impairments (id. at 21-23).

### A. EVALUATION OF PLAINTIFF'S PHYSICAL IMPAIRMENTS

At step two in the sequential analysis, plaintiff bears the burden of establishing that he has an "impairment or combination of impairments which significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c); see 20 C.F.R. § 404.1521(b).   An impairment or combination of impairments is "not severe" when "it does not significantly limit [claimant 's] physical or mental ability to do basic work activities." [13] 20 C.F.R. § 404.1521(a); see Social Security Ruling ["SSR"] 85-28, 1985 WL 56856, at *3 (S.S.A. 1985).  For a claimant to establish that she suffers from a severe impairment or combination of impairments, a claimant must show more than the mere existence of a condition or ailment.  Bowen v. Yuckert, 482 U.S. 137, 153 (1987).

Plaintiff is correct that the medical evidence of record establishes the existence of bullous emphysema in addition to plaintiff's COPD, the latter of which is the only pulmonary-related impairment that the ALJ found severe.  (Dkt. #23, Brief at 18).  Specifically, since 2003, objective medical records, i.e., chest x-rays, have revealed bullae (see Tr. 266, 260-62 (2005 and 2007 x-rays), 558 (2008)), and subsequent to plaintiff's June 21, 2008 onset date of disability, this condition is repeatedly noted particularly because of plaintiff's weakness, fatigue, and shortness of breath on exertion. In July and August, 2008, Dr. Lettera noted plaintiff's fatigue, weakness, and shortness of breath on exertion such that in addition to treating plaintiff's COPD, he prescribed Symbicort and Combivent for plaintiff's bullous

---

[13]"Basis work activities" are the "abilities and aptitudes necessary to do most jobs[,]" and include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b), 416.921(b).

emphysema.  (Tr. 429, 433-34, 441).  In November 2008, Dr. Bigelow, who served as a State-agency examiner, noted that plaintiff reported shortness of breath when he took a flight of stairs or walked a half a block, noted that plaintiff became wheezy and short of breath on walking, and noted that upon physical exam, plaintiff had "audible wheezing and decreased breath sounds" and "[d]ue to this respiratory compromise," plaintiff would have difficulty with work-related activities that required him to perform with exertion, including lifting, carrying heavy objects, standing or walking for prolonged periods, or engaged in prolonged conversations. (Tr. 445-47).  Additionally, plaintiff testified and reported in his applications for benefits that his breathing affects his ability to walk and climb stairs, and his difficulty breathing makes him tired.  (Tr. 40, 53, 175, 202; see Tr. 180, 206).  While the ALJ acknowledges that plaintiff was seen by Dr. Lettera and acknowledges Dr. Bigelow's findings, the ALJ fails to find that this condition is a severe impairment.

In this case, plaintiff has established more than the existence of bullous emphysema. Bowen, 482 U.S. at 153; see Juarbe v. Astrue, No. 3:10 CV 1557 (MRK)(WIG), 2011 WL 4542964, at *6 (D. Conn. Aug. 30, 2011)("Heeding the admonitions of the Second Circuit that the severity regulation should only be used to screen out de minimis claims," the ALJ erred in excluding impairments well documented in the medical record), Recommended Ruling approved and adopted over objection, No. 3:10 CV 1557(MRK)(WIG), 2011 WL 4542962 (D. Conn. Sept. 28, 2011); see Burrows v. Barnhart, No. 3:03 CV 342 (CFD)(TPS), 2007 WL 708627, at *6 (D. Conn. Feb. 20, 2007)(quotations & citation omitted).  Thus, after a review of the record, the Court finds that the ALJ's conclusion that plaintiff's only severe physical impairment is his COPD is not supported by substantial evidence in the records. Plaintiff's  bullous emphysema is well-documented and should have been considered by the

ALJ in her severity determination.[14]

### B. ALJ'S FINDINGS WITH RESPECT TO "SUBSTANCE USE"

42 U.S.C. § 423(d)(2)(C) provides that "[a]n individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." The "key factor" used to determine whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether the claimant would still be found disabled if he stopped using drugs or alcohol. 20 C.F.R. § 404.1535(b)(1); 20 C.F.R. § 416.935(b)(1).

---

[14]Further, the ALJ's RFC assessment does not account for the limitations articulated in the medical records. The ALJ concluded that if plaintiff stopped his substance use, he would have the RFC to lift and carry twenty pounds occasionally and ten pounds frequently, stand and/or walk for about six hours, and sit for six hours. (Tr. 14). This description satisfies the definition of work at the light exertional level which "involves lifting no more than [twenty] pounds at a time with frequent lifting or carrying objects weighing up to [ten] pounds[.]" 20 C.F.R. § 404.1567(b). A job in the light work category "requires a good deal of walking or standing[,]" or, "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). To perform light work, a claimant is required to be on his feet "up to two-thirds of a workday, [with] the full range of light work requir[ing] standing or walking, off and on, for a total of approximately [six] hours of an [eight]-hour workday. Sitting may occur intermittently during the remaining time." Social Security Regulations ["SSR"] 83-10, 1983 WL 31251, at *5 (S.S.A. 1983). The Commissioner contends that the RFC limitations adequately account for Dr. Bigelow's opinion as, in addition to the forgoing, plaintiff should not have exposure to fumes, dust, extreme temperatures, or any other respiratory irritant, and "accounts for Dr. Bigelow's opinion that [p]laintiff should not engage in prolonged, heavy exertion." (Dkt. #24, Brief at 7). While it is undisputed that Dr. Bigelow's opinion is not afforded controlling weight, contrary to defendant's assertion, the ALJ's RFC determination does not "adequately account[ ]" for the limitations in Dr. Bigelow's report. (Id.). As stated above, light work includes standing and/or walking for six hours in the work day, and lifting or carrying up to twenty pounds occasionally. Dr. Bigelow's examination revealed shortness of breath on walking and such "respiratory compromise" that he opined that plaintiff would have difficulty lifting, carrying heavy objects, and standing or walking for prolonged periods. (Tr. 447). These limitations are not accounted for in the ALJ's RFC determination. Additionally, the fact that defendant asserts that the ALJ's RFC determination is supported by the opinions of Drs. Golkar and Walman, state agency physicians who "reviewed the evidentiary record as a whole[,]" is extraordinary when these agency opinions are not supported by the medical record. (Dkt. #24, Brief at 7). The medical record does not support Dr. Golkar's opinion that plaintiff can occasionally lift <u>fifty</u> pounds and frequently lift twenty-five pounds, has the unlimited ability to push and pull, and can <u>climb stairs, ladders, rope or scaffolds</u>. (Tr. 449-50; <u>see also</u> Tr. 460 (Dr. Waldman opined plaintiff can occasionally climb stairs and has unlimited restrictions)(emphasis added)). Accordingly, on remand, the ALJ must consider plaintiff's RFC in light of the foregoing and, if necessary, solicit the testimony of a vocational expert.

Plaintiff contends that the ALJ did not apply the correct legal standards in her reaching her conclusion that plaintiff is not disabled in the absence of substance abuse as an Emergency Teletype, issued in 1996 by the SSA, directs a finding of disability unless evidence established that the claimant would not be disabled if he stopped using drugs or alcohol.  Social Security Teletype, No. EM-96200, at answer 27-29 (Aug. 30, 1996).  (See Dkt. #23, Brief at 20-21).  The Court need not decide whether the Teletype provisions govern this situation,[15] because the ALJ rests her conclusion that plaintiff would not be disabled if he stopped the substance use on the opinion of Dr. Lago, the consultative examiner who concluded that "[w]ith continued absence from drugs and follow[-]up mental health care, [plaintiff should improve."  (Tr. 18, 457 (emphasis added)). According to the ALJ, Dr. Lago's opinion was entitled to dispositive weight "because he is familiar with the requirements of the Social Security Act, he reviewed the claimant's medical and psychiatric histories, he examined the claimant, and his opinions are supported by and are consistent with medical evidence of record."  (Tr. 18).

Shortly before Dr. Lago examined him, plaintiff had undergone a voluntary detoxification program for alcohol abuse (see Tr. 528-40), at the conclusion of which, his condition had improved. (See id.).  However, at the time plaintiff was admitted to that program, he had threatened to kill himself, he was diagnosed with major depressive disorder, severe recurrent, alcohol dependence, and opiate abuse, and he was assigned a GAF of 29,

---

[15]Compare Salazar v. Barnhart, 468 F.3d 615, 622-26 (10th Cir. 2006)(adopting the standard articulated in the Teletype and reversing because the ALJ's conclusion that the claimant would not be disabled in the absence of substance abuse was not supported by substantial evidence), with Parra v. Astrue, 481 F.3d 742, 747-50 (9th Cir. 2007)(treating the Teletype as neither binding nor entitled to deference, and declining to follow it because it "effectively subsidizes substance abuse in contravention of the statute's purpose")(footnote omitted), cert. denied, 552 U.S. 1141 (2008).

which score reflects behavior considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or an inability to function in almost all areas.  (Id.; see American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorder at 32 (4th ed 2000)["DSM-IV-TR"]). An improved condition after four weeks in this program is hardly remarkable.  Additionally, although Dr. Lago opined that plaintiff's "should" improve, the contemporaneous treatment notes from July 2009 forward, when plaintiff was no longer abusing alcohol or drugs, reveal that plaintiff's mental health issues increased. Treatment records from FSW reveal that plaintiff was experiencing crying spells, sleep disturbance, screaming from bad dreams, and resulting fear of sleeping, abnormal eating patterns, feelings of hopelessness, always feeling angry, fatigue, guilt/worthlessness, agitation, rapid thoughts, thoughts of harming himself, and feelings of being followed.  (Tr. 609-10).  Plaintiff was agitated, anxious, depressed, and irritated, his memory was impaired, and his concentration and abstract reasoning were fair.  (Tr. 613).  He was assigned a GAF of 33, which reflects some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  (Tr. 614; see DSM-IV-TR at 32).  A month later plaintiff had some improvement but was diagnosed with major depressive disorder, recurrent, with psychosis, and heroin dependence in recovery, and was assigned a GAF of 45, which score reflects serious symptoms, like suicidal ideation, or serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  (Tr. 607).  These treatment records are consistent with plaintiff's testimony that sometimes -- about twice a week -- he stays by himself because he does not want "to be bothered[]" by others (Tr. 44); when he is depressed, he has suicidal thoughts, he hears voices telling him to kill himself, and he sees

things at night (Tr. 45, 202); he has crying spells about once or twice a week (Tr. 45-46, 50); he has panic episodes where he feels like he is being followed or watched (Tr. 46); and he gets angry for no reason, or gets "too hyper[.]"  (Tr. 48).[16]  As the ALJ observed, this treatment ended, not because of plaintiff's non-compliance or because of continued substance abuse, but because plaintiff lost his entitlements.  (Tr. 18).   The ALJ concluded that "improvement was noted in the record[]" (id.), while ignoring all of the foregoing relating to plaintiff's mental impairments.

The ALJ went on to acknowledge that when plaintiff was able to return for treatment in June 2010, "more acute findings" were made; however, she ignored those findings in her

---

[16]When determining plaintiff's credibility, a strong indication of the credibility of a claimant's statements is their consistency, both internally and with other information in the case record.  See SSR 96-7p,1996 WL 374186, at *4-8 (S.S.A. July 2, 1996);  see Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  An ALJ must compare a claimant's statements made in connection with her claim with statements she made under other circumstances that are in the case record, and statements a claimant made to treating and examining medical sources are especially important.  "After weighing any existing inconsistencies between the plaintiff's testimony of pain and limitations and the medical evidence, the ALJ may discount the plaintiff's subjective testimony with respect to the degree of impairment."  Romano v. Apfel, No. 99 CIV 2689 LMM, 2001 WL 199412, at *6 (Feb. 28, 2001)(citations omitted).  If the ALJ does discredit a plaintiff's testimony, he must do so with sufficient specificity.  Id.

As plaintiff appropriately observes, the ALJ offers conflicting opinions about plaintiff's credibility in her decision.  (Dkt. #23, Brief at 25-27).  First, she states that "[a]fter careful consideration of all the evidence, the undersigned finds that the claimant is credible concerning his symptoms and limitations while abusing substances."  (Tr. 11).  Later, the ALJ states:

If the claimant stopped the substance use, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment . . . below.

(Tr. 15).  Such language is "not only boilerplate; it is meaningless boilerplate."  Parker v. Astrue, 597 F.3d 920, 922 (7th Cir. 2010); see Bethea v. Astrue, No. 3:10-cv-744(JCH), 2011 WL 977062, at *11 (D. Conn. Mar. 17, 2011).   The language used by the ALJ in this case gives this court no guidance as to which parts of plaintiff's testimony are credible and why.  Bethea, 2011 WL 977062, at *13.  On remand, the ALJ shall review plaintiff's credibility in light of the medical evidence of record and shall address the specific reasons for her credibility findings.

final analysis, which findings are relevant to consideration of plaintiff's condition when he is not abusing substances.  (Tr. 18; see Tr. 17).  As of June 2010, when plaintiff was still not abusing any substances and continuing on methadone maintenance (see Tr. 619), plaintiff was diagnosed with mood disorder, NOS, rule out major depressive disorder, and opioid dependence in full sustained remission.  (Tr. 622-23).  The ALJ also did not consider that plaintiff continued to experience crying spells, sleep disturbance, loss of initiative, anger, irritability, fatigue, impaired concentration, anxiety, and nightmares.  (Tr. 617-18).  Additionally, a month later, plaintiff was diagnosed with major depressive disorder, recurrent, severe without psychotic gestures, and was assigned a GAF of 45, and as on September 2010, when plaintiff's treatment ended due to a lack of insurance, he was assigned a GAF of 33, which was the same GAF score assigned to him in June 2009 when plaintiff was also clean and sober.  (Tr. 625, 629-31; see Tr. 614).  Rather than address any of the foregoing, the ALJ concluded that "the records show improvement and with continued treatment and compliance, his improvement should continue." (Tr. 18).

### C. DEVELOPMENT OF THE RECORD

An ALJ must make a determination based on a thorough medical record. Veino v. Barnhart, 312 F.3d 578, 588-89 (2d Cir. 2002)(citation omitted).  The Social Security Regulations place an affirmative duty on decision makers to seek clarification or elaboration from medical sources, as 20 C.F.R. § 404.1512(e)(1) provides:

> We will seek additional evidence or clarification from your medical source when the report from your medical source . . . does not contain all the necessary information . . . . We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source.

ALJ Horton had the responsibility to seek legible notes from Dr. Klufas (see Tr. 357, 364-73),

plaintiff's treating physician for his hepatic and pancreatic issues, and "[c]ourts have continued to stress this duty even when a claimant is represented by counsel." Geracitano v. Callahan, 979 F. Supp. 952, 956-57 (W.D.N.Y. 1997)(citations omitted); Moran v. Astrue, 569 F.3d 108, 112-13 (2d Cir. 2009).[17]

### V. CONCLUSION

For the reasons stated above, plaintiff's Motion for Order to Reverse the Decision of the Commissioner (Dkt. #23) is granted in part such that this matter is remanded for consideration of all of plaintiff's physical impairments in step two and a new RFC assessment, with the use of vocational expert testimony, if necessary (see Section IV.A. supra), consideration of plaintiff's mental impairments when not abusing alcohol or drugs (see Section IV.B. supra), a review of plaintiff's credibility in light of the medical evidence of record and articulation of the specific reasons for the credibility findings (id.); further development of the record, including seeking and considering legible notes from Dr. Klufas (see Section IV.C. supra); and the consideration of all of plaintiff's impairments in combination (id.); and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #24) is denied.

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file**

---

[17]Plaintiff also asserts that the ALJ failed to consider the combination of plaintiff's impairments including his Hepatitis C and pancreatitis. (Dkt. #23, Brief at 33-35). On remand, the ALJ shall consider Dr. Klufas legible records as well as the other medical records in the transcript so that a thorough assessment of the combination of plaintiff's impairments may be completed.

**timely objection to Magistrate Judge's recommended ruling may preclude further**

**appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 21st day of August, 2012.


 /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge